# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| CORABELL B. ARPS, ) | |
| of Glenburn, Maine, on behalf of ) | Court File No.:_____ |
| herself and all other similarly ) | |
| situated, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MICRON TECHNOLOGY, INC., ) | |
| ) | |
| MICRON SEMICONDUCTOR ) | |
| PRODUCTS, INC., ) | **CLASS ACTION COMPLAINT** |
| ) | |
| CRUCIAL TECHNOLOGY, INC., ) | **JURY TRIAL DEMANDED** |
| ) | |
| SAMSUNG ELECTRONICS CO., LTD., ) | |
| ) | |
| SAMSUNG SEMICONDUCTOR, ) | |
| INC., ) | |
| ) | |
| MOSEL-VITELIC CORPORATION, ) | |
| ) | |
| (MOSEL-VITELIC CORPORATION, ) | |
| (USA), ) | |
| ) | |
| INFINEON TECHNOLOGIES AG, ) | |
| ) | |
| INFINEON TECHNOLOGIES NORTH ) | |
| AMERICA CORP., ) | |
| ) | |
| HYNIX SEMICONDUCTOR, INC., ) | |
| ) | |
| HYNIX SEMICONDUCTOR AMERICA, ) | |
| INC., ) | |
| ) | |
| ELPIDA MEMORY, INC., ) | |
| ) | |
| ELPIDA MEMORY (USA) INC., ) | |
| ) | |
| NEC ELECTRONICS AMERICA, INC., ) | |
| NANYA TECHNOLOGY ) | |

| | |
|---|---|
| CORPORATION, | ) |
| | ) |
| NANYA TECHNOLOGY | ) |
| CORPORATION USA, | ) |
| | ) |
| WINBOND ELECTRONICS | ) |
| CORPORATION, | ) |
| | ) |
| WINBOND ELECTRONICS | ) |
| CORPORATION AMERICA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, by and through counsel, on behalf of herself and all others similarly situated, brings this action against Defendants, and demands trial by jury, complaining and alleging upon information and belief as follows:

## INTRODUCTION

1.  Plaintiff Corabell B. Arps ("Plaintiff"), brings this class action pursuant to M$_E$. R$_{EV}$. S$_{TAT}$. A$_{NN}$. T$_{ITLE}$ 10, ▪ 1104, under which indirect purchasers have standing to sue for antitrust injuries, against Defendants Micron Technology Inc., Micron Semiconductor Products, Inc., Crucial Technology Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Mosel-Vitelic Corporation, Mosel-Vitelic Corporation (USA), Infineon Technologies AG, Infineon Technologies North America Corp., Hynix Semiconductor, Inc., Hynix Semiconductor America, Inc., Elpida Memory, Inc., Elpida Memory (USA) Inc., NEC Electronics America, Inc., Nanya Technology Corporation, Nanya Technology Corporation USA, Winbond Electronics Corporation, and Winbond Electronics Corporation America (collectively "Defendants").

2.  This case arises out of a long-running nationwide conspiracy beginning no later than 1999, and continuing until the present ("Class Period"), among all Defendants and their co-

conspirators with the purpose and effect of fixing prices, allocating market shares, eliminating and suppressing competition, and committing other unlawful practices designed to inflate and stabilize the prices of Dynamic Random Access Memory ("DRAM").

3. DRAM is sold indirectly to Plaintiff and other consumers in Maine, either as an installed component in personal computers and other electronic devices or as a separately-purchased component used for computer upgrades.

## JURISDICTION AND VENUE

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the defendant.

5. Venue in the District of Maine at Bangor is appropriate pursuant to 28 U.S.C. § 1391(a) and Rule 3(b) of the Rules of the United States District Court for the District of Maine. A substantial part of the trade and commerce in DRAM, including but not limited to the sale of DRAM at supra-competitive prices, occurred in this District.

## PARTIES

**Plaintiff**

6. Plaintiff Corabell B. Arps is a resident of Glenburn, Maine, and has indirectly purchased DRAM that was manufactured, distributed and/or sold by one or more of the Defendants during the Class Period, and was injured by the antitrust acts alleged in this complaint. On or about May 18, 2002, Plaintiff Arps purchased an Apple computer.

**Defendants**

7. Defendant Micron Technology, Inc. is a Delaware corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho 83707. During the time period covered in this complaint, Micron Technology, Inc. designed, developed, manufactured, sold and distributed DRAM throughout the United States. DRAM is Micron's primary semiconductor product.

8. Defendant Micron Semiconductor Products, Inc. is an Idaho corporation located at 8000 South Federal Way, Boise, Idaho and is a wholly owned and controlled subsidiary of Defendant Micron Technology, Inc. During the time period covered in this complaint, Micron sold DRAM through its Crucial Technology retail sales division to computer manufacturers and other end users throughout the United States.

9. Defendant Crucial Technology, Inc. ("Crucial") is a corporation with its principal place of business in Boise, Idaho. Crucial is a wholly owned subsidiary of Micron which operates the distribution business of Micron Technologies, Inc. (These three Micron entities are collectively referred to as "Micron").

10. Defendant Samsung Electronics Co., Ltd., is a Korean corporation with its executive offices at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Korea. During the time period covered in this complaint, Samsung Electronics Co., Ltd. manufactured, sold and distributed DRAM throughout the world, including the United States.

11. Defendant Samsung Semiconductor, Inc. is a California corporation located at 3655 North First Street, San Jose, California 95134. Samsung Semiconductor, Inc. is a wholly owned and controlled subsidiary of Defendant Samsung Electronics Co., Ltd. (together referred

to as "Samsung"). During the time period covered by this complaint, Samsung Semiconductor, Inc. sold and distributed DRAM throughout the United States.

12. Defendant Mosel-Vitelic Corporation maintains its headquarters at No. 19 Li Hsin Road, Hsinchu Science Based Industrial Park, Hsinchu, Taiwan. During the time period covered by this complaint, Mosel-Vitelic Corporation sold and distributed DRAM throughout the United States.

13. Defendant Mosel-Vitelic Corporation (USA) is a California corporation located at 3910 North First Street, San Jose, California 95134. Mosel-Vitelic (USA) is a wholly owned and controlled subsidiary of Defendant Mosel-Vitelic Corporation (together referred to as "Mosel-Vitelic"). During the time period covered by this complaint, Mosel-Vitelic (USA) sold and distributed DRAM throughout the United States.

14. Defendant Infineon Technologies AG, a German corporation with its, headquarters at St. Martin-Str. 53, 81669, Munich, Germany. During the time period covered in this complaint, Infineon Technologies AG manufactured, sold, and distributed DRAM throughout the world, including the United States.

15. Defendant Infineon Technologies North America Corp. is a Delaware corporation which maintains offices at 1730 North First Street San Jose, CA 95112. Infineon Technologies North America Corp. is a wholly owned and controlled subsidiary of Defendant Infineon Technologies AG (together referred to as "Infineon"). During the time period in this complaint, Infineon Technologies North America Corp. sold and distributed DRAM throughout the United States.

16. Defendant Hynix Semiconductor, Inc. maintains its head offices at SAN 13 6-1, Ami-Ri Bubal-eub, Ichon-si, Kyoungki-do, Korea. During the time covered in this complaint,

Hynix Semiconductor, Inc. manufactured, sold and distributed DRAM throughout the world, including the United States.

17. Defendant Hynix Semiconductor America, Inc. is a California corporation located at 3101 North First Street, San Jose, California 95134. Hynix Semiconductor America, Inc. is a wholly owned and controlled subsidiary of Defendant Hynix Semiconductor, Inc. (together referred to as "Hynix"). During the time period covered by this complaint, Hynix Semiconductor America, Inc. sold and distributed DRAM throughout the United States.

18. Defendant Elpida Memory, Inc. ("Elpida") maintains its executive offices at Sumitomo Seimei Yaesu Bldg., 3F, 2-1 Yaseu 2-chome, Chuo-ku, Tokyo, Japan. During the time period covered in this complaint, Elpida manufactured, sold and distributed DRAM throughout the United States.

19. Defendant Elpida Memory (USA) Inc., located at 2001 Walsh Avenue, Santa Clara, CA 95050, is a wholly owned subsidiary of Elpida which sold and distributed DRAM throughout the United States during the time period covered in this complaint.

20. Defendant NEC Electronics America, Inc. ("NEC") maintains its corporate headquarters at 2880 Scott Boulevard, Santa Clara, California 95050-2554 and its manufacturing plant in Roseville, California. It is a wholly owned subsidiary of NEC Electronics Corporation. During the time period covered in this complaint, NEC manufactured, sold and distributed DRAM throughout the United States.

21. Defendant Nanya Technology Corporation is a Taiwanese corporation which maintains its headquarters at HWA YA Technology Park, 669, Fu Hsing 3rd Rd. Keuisban, Taoyuan, Taiwan. During the time period covered by this complaint, Nanya Technology Corporation sold and distributed DRAM throughout the United States.

22. Defendant Nanya Technology Corporation USA is located at 675 E. Brokaw Road, San Jose, California 95112. Nanya Technology Corporation USA is a branch office of Defendant Nanya Technology Corporation. In addition to the sales and marketing office in San Jose, Nanya Technology Corporation operates memory design centers in San Jose and Houston, Texas. During the time period covered by this complaint, Nanya Technology Corporation USA sold and distributed DRAM throughout the United States.

23. Defendant Winbond Electronics Corporation ("Winbond"), is headquartered at 4, Creaton Road, 111, Science-Based Industrial Park, Hsinchu, Taiwan. During the time period covered in this complaint, Winbond manufactured, sold and distributed DRAM throughout the United States.

24. Defendant Winbond Electronics Corporation America, located at 2727 North First Street, San Jose, CA 95134, is a wholly-owned subsidiary of Winbond which sold and distributed DRAM throughout the United States during the time period covered in this complaint.

**Co-Conspirators**

25. Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint (the "Co-conspirators") have participated in the violations of the antitrust laws of Maine for which Plaintiff seeks relief, and have performed acts and made statements in furtherance of the conspiracy.

26. The acts charged in this Complaint have been done by Defendants or were ordered or done by Defendants' officers, agents, employees, or representatives, while actively engaged in the management of Defendants' affairs.

## BACKGROUND

27. All PCs use random access memory ("RAM") for their main system memory. DRAM is the most common kind of RAM chip sold both in new computers and other electronic devices such as printers, digital cameras, wireless telephones and as a separately-purchased component for computer upgrades in the United States.

28. DRAM is a high density, low-cost-per bit, memory component that stores digital information and provides high-speed storage and retrieval of data as it is processed.

29. DRAM is a commodity product with multiple firms offering essentially identical parts. Thus, the DRAM market resembles a commodity exchange. DRAM pricing is benchmarked for contract and spot market pricing based on 128 Megabits ("Mb") of DRAM.

30. DRAM is sold in individual chips (megabits) or in modules, with several chips attached to the module (a "SIMM" or a "DIMM"). A bit is a single character of data (zero or one). A byte is eight characters of data. Therefore, eight bits make a byte. For example, eight sets of 128 Megabit DRAM chips are needed to make a 128 Megabyte ("MB") dual inline memory module ("DIMM").

31. Most DRAM that is installed in personal computers or sold as a component part for computer upgrades is sold in modules of MB of DRAM. During the Class Period, the common amount of MB of DRAM in personal computers was 64MB, 128MB or 256MB.

32. DRAM pricing has a dramatic effect on original equipment manufacturers ("OEMs"), such as Dell, since DRAM can make up 5% to 6% of a PC's total materials cost, according to a report by Jim Cantore, principal analyst for memory with market researcher iSuppli.

33. Worldwide sales of DRAM totaled approximately $14 billion in 2001, with a projected reach of $17.6 billion in 2004. The United States accounted for close to 30% of the total market in 2004.

34. Currently, half of the total worldwide DRAM supply is controlled by Samsung and Micron. Along with these two companies, Infineon Technology, Hynix Semiconductor, and Nanya Technology, control 82% of the market worldwide.

## THE CONSPIRACY

35. During the period 1999-2001, the prices of DRAM declined dramatically. By the Fall of 2001, 128 Mb of DRAM was selling for less than $1.

36. In the fall of 2001, Defendants agreed to reduce supply in order to artificially raise prices. As part of their agreement, each Defendant agreed to cut production so that, as supplies were restrained by their agreement, prices for DRAM would increase. Thus, in or about the beginning of the Class Period, Defendants entered into an agreement or understanding regarding the sale and marketing of DRAM, the purpose of which was to raise, fix and stabilize the prices for DRAM.

37. An article dated August 14, 2001 on the website *Silicon Strategies*, which labels itself as the news source for the semiconductor industry, and other industry news websites reported that Defendant Mosel Vitelic and other DRAM producers met to discuss measures that could be taken to halt "the downward spiral of DRAM prices." Defendant Mosel Vitelic's Vice President Thomas Chang indicated that the Taiwanese manufacturers met that month, and that "a basis for understanding had been reached" between chip makers to "trim some production starting [in] September." Chang stated that all DRAM makers would have to agree for the plan to have the desired effect of raising prices.

38.     Because the Taiwan-based Defendants did not have sufficient market share to raise prices themselves, they needed Micron, Samsung and Infineon to reduce production and raise prices as well.  In a Micron email dated November 26, 2001, a Micron executive spelled out Defendant Infineon's attempts to lay the foundation for price increases, and Defendants Micron and Samsung's coordination of their efforts to fix and raise prices:

> Most OEMs prefer to negotiate pricing for the 1st and the 15th of each month. . . We will begin price discussions with the OEMs today.  Infenion [sic] has already laid the ground work by trying to lift pricing a few weeks ago.  We believe that they have been successful with only a couple of OEMs to date.  Samsung has also had discussions with the OEMs early last week and is preparing them for increases in the first part of December.  ***The consensus from all suppliers is that if Micron makes the move, all of them will do the same and make it stick*** (emphasis added).

39.     Beginning in November 2001, prices for DRAM rose dramatically, and by March 2002, contract prices had risen as high as $4.80 for 128 Mbit of DRAM.  In the spot market, the price of the benchmark 128 Mbit of DRAM increased to $4.48 by March 11, 2002.

40.     In late April 2002, when the spot market price fell below $3, the Defendants moved to shore up their conspiracy.

41.     According to articles in the *Detroit News* and the *Taipei Times* in May 2002, Defendant Mosel Vitelic Vice President Thomas Chang said that Defendant Mosel Vitelic had agreed with rivals to restrict spot market sales, aiming to boost chip prices.  According to these news reports, Chang allegedly "confirmed that his company had reached an agreement with Hynix Semiconductor Inc. and Samsung Electronics to push up DRAM prices to $3 a chip by stopping dumping of the chips.  Hynix and Samsung executives visited Mosel-Vitelic and Nanya Technology Corp. recently to discuss the agreement," the newspaper reported. "Since then, the 128-Mbit DRAM price has rebounded 62 percent, from $1.60 to $2.60 a chip."

42. An investigation by the Department of Justice ("DOJ") was sparked in part by the published reports of meetings in Asia among the major DRAM vendors, including the apparent admission by a Mosel-Vitelic officer of price-fixing meetings that appeared in Taiwan's *Commercial Times* on May 29, 2002.

43. On June 18, 2002, Defendant Micron confirmed that it had received a grand jury subpoena from the U.S. District Court for the Northern District of California on June 17, 2002, seeking information regarding an investigation by the Antitrust Division of the Department of Justice into possible antitrust violations in the DRAM industry.

44. Defendant Samsung Semiconductor, Inc. likewise confirmed that it was served with a subpoena from the U.S. Department of Justice on June 17, 2002.

45. By the end of June 2002, all of the major memory manufacturers—the Defendants here—acknowledged that they had been subpoenaed to turn over pricing information for DRAM.

46. In December 2003, numerous news services, including the *LA Times*, *Reuters*, and *Bloomberg News*, reported that Micron is in talks to win amnesty in exchange for providing information to help the DOJ's antitrust case against the other DRAM manufacturers.

47. On January 24, 2004, Alfred P. Censullo, former Micron sales manager, pleaded guilty to obstruction of justice in the DOJ investigation. According to the guilty plea, after learning of the grand jury investigation and subpoena, Censullo altered his handwritten notes pertaining to telephone conferences among Micron sales managers discussing price recommendations for DRAM sales to the major computer OEM customers and the prices at which competing DRAM suppliers would sell their products to major OEMs in upcoming price negotiations. In addition, Censullo pleaded guilty to removing and concealing 14 pages from his notebooks that contained competitor pricing information.

48. On October 20, 2004, Infineon Technologies AG admitted its participation in a price fixing conspiracy from April 1, 1999 through June 15, 2002. Infineon Technologies AG's U.S. sales during that period to the six largest OEMs, Dell, Inc. ("Dell"), Hewlett-Packard Company ("H-P"), Compaq Computer Corporation ("Compaq"), Apple Computer Inc. ("Apple), Gateway, Inc. ("Gateway"), and Internal Business Machines Corporation ("IBM") was over one billion dollars. Infineon pleaded guilty and will pay a $160 million fine.

49. On May 11, 2005, Hynix admitted its participation in a price-fixing conspiracy from April 1, 1999 through June 15, 2002. Hynix's U.S. sales during that period were $839 million to the six largest OEMs, including Dell, H-P, Compaq and IBM. Hynix pleaded guilty and will pay a $185 million fine.

50. Micron, the only U.S.-based manufacturer, acknowledged that it has been accepted into the DOJ's Corporate Leniency Program, and is cooperating with the investigation. In announcing its cooperation agreement with the government, Steve Appleton, president, CEO and chairman of Micron, stated that: "The DOJ's investigation revealed evidence of price fixing by Micron employees and its competitors on DRAM sold to certain computer and server manufacturers."

51. Defendant Samsung is also under investigation by the Department of Justice. On September 2, 2004, the Ninth Circuit quashed a subpoena *duces tecum* addressed to Devin Cole, a former Samsung sales representative. Mr. Cole refused to turn over documents to the DOJ, citing the Fifth Amendment. Prior to the subpoena, Mr. Cole described discussions he had with Samsung's competitors pursuant to a "range pact" that included "the ranges of prices, where each competitor felt that others would price in the range, and whether each competitor would move prices 'a little' or 'a lot.'"

## **FRAUDULENT CONCEALMENT**

52.     Throughout the Class Period, Defendants and their Co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

53.     Defendants and their Co-conspirators engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

54.     Defendants' wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, and which, in fact, successfully precluded detection.  Throughout the Class Period, Plaintiff could not have discovered Defendants' unlawful scheme and conspiracy because of Defendants' effective, affirmative, and fraudulent concealment of their activities.

55.     Throughout the Class Period, Plaintiff could not reasonably have known of Defendants' antitrust violations.  Plaintiff and the members of the Class could not have known, if at all, of Defendants' antitrust violations until at least June 2002, when the Defendants acknowledged that they were being investigated by the DOJ.

56.     Plaintiff and the members of the Class could not possibly have discovered Defendants' unlawful scheme and conspiracy before June 2002 because of the successful deceptive practices and techniques of secrecy employed by Defendants and their Co-conspirators to avoid detection of, and to affirmatively and fraudulently conceal, their wrongful conduct. Because Defendants' affirmative and fraudulent concealment was effective, there were no circumstances before June 2002 that should have led Plaintiff to suspect the existence of Defendants' illegal price-fixing scheme.

57. Plaintiff could not have discovered her cause of action earlier than June 2002 because Defendants' fraudulent concealment of their conspiracy was effective.

58. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their Co-Conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## **EFFECTS**

59. The above combination and conspiracy has had the following effects, among others:

   a. price competition in the sale of DRAM by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States, including Maine;

   b. prices for DRAM sold by Defendants have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States, including Maine; and

   c. Maine indirect purchasers of DRAM have been deprived of the benefit of free and open competition in the purchase of DRAM.

60. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and other members of the class have been injured in their business and property in that they paid more for DRAM than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

## **CLASS ACTION ALLEGATIONS**

61. Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(3) on her own behalf and on behalf of the following Class.

62. The Class is defined as:

> All persons or entities in Maine, who purchased, indirectly, and not for resale, DRAM or products containing DRAM manufactured by any Defendant, their subsidiaries, or co-conspirators from at least 1999 to the present.
>
> Excluded from the class are all federal governmental entities, Defendants, their subsidiaries and affiliates.

63. Plaintiff reserves the right to expand, modify or alter the class definition, including the time period, in response to information learned during discovery.

64. Plaintiff does not presently possess information identifying the exact size of the Class. Based upon the nature of the trade and commerce involved, Plaintiff believes the total number of class members is sufficiently numerous such that joinder of all Class members would be impracticable. Fed. R. Civ. P. 23(a)(1).

65. Numerous questions of law or fact arise from Defendants' anticompetitive conduct and are common to the class. Among the questions of law or fact common to the class are:

   a. whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain or stabilize the prices of, or allocate the market for, DRAM sold in Maine;

   b. whether the conduct of Defendants caused prices of DRAM sold in Maine to be artificially inflated to non-competitive levels; and

    c. whether Plaintiff and other members of the class were injured by the conduct of Defendants and, if so, the appropriate class-wide measure of damages.

66. These common questions of law or fact are common to the class, and predominate over any other questions affecting only individual class members.  Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

67. Plaintiff in this proposed class action asserts claims typical of those of the individual members of the proposed Class.  Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.  Fed. R. Civ. P. 23(a)(3).

68. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has no interests antagonistic to the Class.  Plaintiff has suffered the same harm as the members of the Class and has, and will continue to, zealously pursue claims against Defendants.  Plaintiff has retained counsel competent and experienced in the prosecution of complex class actions, and in particular, counsel has broad experience in complex antitrust litigation similar in size, scope, and complexity to the present case.  Fed. R. Civ. P. 23(a)(4).

69. A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct.  Thus, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Moreover, even if the Class members themselves could afford such individual litigation, the judicial system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties

and the judicial system due to the complex legal and factual issues presented by this case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Fed. R. Civ. P. 23(b)(3).

## COUNT I
### (Violation of Maine Antitrust Law)

70. Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as if fully set forth herein.

71. During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed DRAM in Maine.

72. During the Class Period, each of the Defendants named herein, directly or indirectly and through affiliates they dominated and controlled, did the following to affect their conspiracy to fix, maintain or stabilize prices of DRAM sold and/or distributed in Maine, in violation of ME. REV. STAT. ANN. TITLE 10, ▪ 1101:

   a. Participated in meetings, conversations, and communications in the United States and elsewhere with competitors to discuss the prices of DRAM to be sold in the United States;

   b. Agreed, during those meetings, conversations, and communications, to charge prices of DRAM at certain levels to be sold in the United States;

   c. Issued price quotations in accordance with the agreements reached; and

   d. Exchanged information on sales of DRAM to customers, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

73.     This horizontal price-fixing conspiracy restrained trade or commerce in Maine, and it was designed to have, and did have, a substantial and adverse impact on prices for DRAM in Maine during the Class Period.

74.     As a result, Plaintiff and other members of the Class have sustained damages in an amount to be determined at trial.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, and respectfully requests that the Court:

1. Certify this action to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint her as a Class Representative, and her counsel as Class Counsel, and direct that reasonable notice be given to members of the Class;

2. Adjudge and decree that Defendants and each of them engaged in an unlawful contract, combination and conspiracy in restraint of trade or commerce, in violation of ME. REV. STAT. ANN. TITLE 10, ▪ 1104, granting standing to indirect purchasers for antitrust injuries, and that the Court award Plaintiff and the Class: (i) actual damages in an amount to be proved at trial as a result of the wrongful conduct alleged, plus interest and costs; (ii) treble damages under the Maine Antitrust Act; and (iii) all other damages available under the laws of Maine, including pre-judgment and post-judgment interest;

3. Award Plaintiff and other members of the Class the costs of the suit, including reasonable investigative costs, reasonable experts' fees, reasonable attorneys' fees; and

    4.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims for which she is entitled to a jury trial.

Dated: August 10, 2005                s/Samuel W. Lanham, Jr.
                                                   Samuel W. Lanham, Jr.
                                                   **Cuddy & Lanham, P.A.**
                                                   470 Evergreen Woods
                                                   Bangor, Maine 04401
                                                   (207) 942-2898

| | |
|---|---|
| Daniel R. Karon | Daniel E. Gustafson |
| **Goldman Scarlato & Karon, P.C.** | Renae D. Steiner |
| 55 Public Square, Suite 1500 | **Gustafson Gluek PLLC** |
| Cleveland, OH 44113 | 725 Northstar East |
| | 608 Second Avenue South |
| | Minneapolis, MN 55402 |
| | |
| David Boies | Edward M. Gergosian |
| Timothy D. Battin | Robert Gralewski, Jr. |
| Ian Otto | **Gergosian & Gralewski LLP** |
| **Straus & Boies, LLP** | 550 West "C" Street, Suite 1600 |
| 10513 Braddock Road | San Diego, CA 92101 |
| Fairfax, VA 22032 | |
| | |
| Dennis Stewart | Ira Neil Richards |
| **Hulett Harper Stewart LLP** | **Trujillo Rodriguez & Richards, LLC** |
| 550 West "C" Street, Suite 1600 | The Penthouse |
| San Diego, CA 92101 | 226 West Rittenhouse Square |
| | Philadelphia, PA 19103 |
| | |
| Natalie Finkelman Bennett | Wyatt B. Durrette |
| **Shepherd, Finkelman, Miller & Shah, LLC** | Christine Williams |
| 35 E. State Street | **Durrett Bradshaw PLC** |
| Media, PA 19063 | 600 East Main Street, 20th Floor |
| | Richmond, VA 23219 |

| | |
|---|---|
| Jeffery A. Bartos<br>**Guerrieri Edmond & Clayman & Bartos, PC**<br>1625 Massachusetts Avenue, NW<br>Washington, D.C. 20036 | Andrew S. Friedman<br>Francis J. Balint, Jr.<br>Patrick J. Van Zanen<br>**Bonnett, Fairbourn, Friedman & Balint, PC**<br>2901 North Central Avenue, Suite 1000<br>Phoenix, AZ 85012-3311 |
| David A. Freedman<br>Joseph Goldberg<br>**Freedman Boyd Daniels Hollander &Goldberg, PA**<br>20 First Plaza, Suite 700<br>Albuquerque, NM 87102 | Michael G. Simon<br>Kevin Pearl<br>**Frankovitch, Anetakis, Colantonio & Simon**<br>337 Penco Road<br>Weirton, West Virginia 26062 |

*Attorneys for Plaintiff Corabell B. Arps*